332 So.2d 336 (1976)
In re Christina I. CONNORS.
No. 46799.
Supreme Court of Florida.
May 5, 1976.
Eric Haugdahl, Jacksonville, and James G. Mahorner, Tallahassee, for appellant.
James T. Russell, State's Atty., and George E. Tragos, Asst. State's Atty., for appellee.
ROBERTS, Justice.
This cause is before us on direct appeal from a final order of the Circuit Court, Sixth Judicial Circuit, which passes upon the constitutional validity of Section 394.467(3)(b), Florida Statutes.[1] We have jurisdiction *337 pursuant to Article V, Section 3(b)(1), Constitution of Florida.
Pertinent to the determination of this cause are the following facts. Dr. Stuart Cahoon, Director of the Division of Mental Health, refused to admit Christina I. Connors to the State of Florida mental health facilities after her acquittal by reason of insanity and the subsequent Order of Commitment issued on December 2, 1974, by Circuit Judge Lawrence E. Keough of the Sixth Judicial Circuit pursuant to Criminal Rule 3.460. In the Order of Commitment, Judge Keough explained that the discharge of the defendant would be manifestly dangerous to the peace and safety of the people with whom defendant might come in contact with. On December 6, 1974, Judge Keough entered an Order to Show Cause directed to the Director of the Division of Mental Health to show why he should not be held in contempt of court for failure to comply with the judgment of acquittal by reason of insanity and Order of Commitment. In a Supplemental Commitment entered December 20, 1974, Judge Keough stated:
"This cause coming on to be heard upon the Order to Show Cause heretofore entered by this Court on December 6, 1974, and upon the Motion to Dismiss Order to Show Cause filed by Dr. Stuart Cahoon and it having been made to appear that Dr. Stuart Cahoon as Director of the Division of Mental Health, Department of Health and Rehabilitative Services is willing and anxious to carry out and fulfill his official obligations as Director and that because of the language contained in Florida Statute 394.467(3)(b), as amended, he believes that, notwithstanding Florida Rule of Criminal Procedure 3.460, the defendant, Christina I. Connors, is not commitable to the Division of Mental Health of the Department of Health and Rehabilitative Services unless she is also civilly committed pursuant to Part I of Chapter 394 of the Florida Statutes; that this Court, pursuant to Rule 3.460 and as evidenced by this Court's Judgment of December 2, 1974, has found that the discharge of the defendant would be manifestly dangerous to the peace and safety of the people with whom defendant might come in contact and intended that the defendant be forthwith committed to the Division of Mental Health for hospitalization and treatment in accordance with Rule 3.460 and that she not undergo further civil commitment procedures as set forth in Part I of Chapter 394; it further having been made to appear that the refusal of the Division of Mental Health of the Department of Health and Rehabilitative Services to admit the defendant subsequent to December 2, 1974, although believed by the director to be justified, has caused the defendant unintended and additional incarceration in the Pasco County Detention Center where she has been a nuisance and danger *338 to herself and others and that continuation of the status quo cannot be further tolerated by the Court."
proceeded to find:
"1. That the provisions of Florida Statute 394.467(3)(b) relating to Part I, Chapter 394 are unconstitutional or otherwise ineffective as applied to this defendant and others who are committed to the Division of Mental Health of the Department of Health and Rehabilitative Services by Court Order pursuant to Rule 3.460 after having been acquitted by reason of insanity and a finding made by the Court that defendant's discharge or going at large would be manifestly dangerous to the peace and safety of the people.
"2. That under these circumstances, the above finding appears to be more appropriate at this time than a continuation of contempt proceedings against Dr. Stuart Cahoon."
and ordered that:
"1. That Florida Statute 394.467(3)(b) is unconstitutional or otherwise ineffective and inoperative as applied to the defendant, Christina I. Connors, and all other defendants in like circumstances.
"2. That Dr. Stuart Cahoon, as Director of the Division of Mental Health of the Department of Health and Rehabilitative Services, admit the defendant, Christina I. Connors, for hospitalization and treatment within ten (10) days from the date hereof and that other defendants likewise be admitted in the future forthwith and without the occurrence of civil commitment proceedings who by Court Order are committed to the Division of Mental Health pursuant to Rule 3.460 upon Court findings that such person's discharge or going at large shall be manifestly dangerous to the peace and safety of the people."
Sub judice, Judge Keough's determination of the present mental state of Connors as posing a dangerous threat to the peace and safety of the people was made separately from the judgment of not guilty by reason of insanity.
We agree with the reasoning and conclusions of the trial court under review and find that Judge Keough acted properly pursuant to Rule 3.460, Florida Rules of Criminal Procedure, in ordering that Christina I. Connors be committed after a determination of her mental state at the time of his Order of Commitment. Rule 3.460, Florida Rules of Criminal Procedure, provides:
"When a person tried for an offense shall be acquitted by the jury for the cause of insanity, the jury, in giving their verdict of not guilty, shall state that it was given for such cause. If the discharge or going at large of such insane person shall be considered by the court manifestly dangerous to the peace and safety of the people, the court shall order him to be committed to jail or otherwise to be cared for as an insane person and such person shall be held in custody until released by order of the committing court, or may give him into the care of his friends, on their giving satisfactory security for the proper care and protection of such person; otherwise he shall be discharged."
A determination by the trial judge that one found not guilty by reason of insanity is manifestly dangerous to the community presupposes that the trial judge means that the defendant is manifestly dangerous at the time of commitment, because the jury verdict or adjudication by the trial judge of not guilty of the crime charged by reason of insanity relates to his mental condition at the time of commission of the crime which could have occurred many months or even years before the adjudication.
Section 394.467(3)(b), Florida Statutes, does not purport to veto or repeal Rule 3.460, F.Cr.R.P., as contemplated by Article *339 V, Section 2, Constitution of Florida. Cf. In Re Clarification of Florida Rules of Practice and Procedure, 281 So.2d 204 (Fla. 1973). Relative to appellant's argument that the statute supersedes the rule because of the substantive nature of the matter dealt with therein, this Court stated in Powell v. Genung, 306 So.2d 113 (Fla. 1974), at 115-116:
"This rule is substantially identical to Section 919.11, Florida Statutes, the statutory precursor of Rule 3.460, which statutory provision was repealed by the Legislature by Chapter 70-339, Laws of Florida, as having been superceded by the Rules of Criminal Procedure. Section 919.11, F.S., had been interpreted by the courts of this state to allow continuing jurisdiction over petitioner in the trial court to determine by subsequent hearing and order whether defendant was still manifestly dangerous to the public. State v. Eaton, 161 So.2d 549 (Fla.App. 1964), Oksten v. State, 173 So.2d 489 (Fla.App. 1965), cert. den. 177 So.2d 11 (Fla. 1965), U.S. cert. den. 382 U.S. 867, 86 S.Ct. 138, 15 L.Ed.2d 105."
The instant cause is controlled by our decision in Powell v. Genung, supra.[2] The material questions of law argued, sub judice, were discussed and disposed of in that decision and it would serve no useful purpose to repeat that discussion here.
In support of her position that Rule 3.460 does not provide the proper constitutional safeguards, appellant cites Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), and Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). This Court in response to the same assertions by petitioner in Powell v. Genung, supra, opined:
"The committing court granted this full hearing whereat petitioner was represented by counsel, and at the conclusion of which the trial judge properly determined that petitioner continues at the present time to pose a danger to others. See Oksten v. State, supra, and State v. Eaton, supra.[3]
[3.] We are not unmindful of the decisions of the Supreme Court in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), and Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), with which the instant decision is clearly consistent. Those decisions deal with the right to a hearing before commitment to a mental hospital."
Sub judice, defendant was given a hearing immediately following her adjudication of not guilty by reason of insanity to determine her mental condition and the danger posed thereby to the community at this time. At this hearing, defense counsel was present and both sides stipulated to the doctors' reports.
The procedure set out by Rule 3.460, F. Cr.R.P., and that followed by the trial court below accord with the above-cited cases from the Supreme Court of the United States. Accord also: O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 decided June 26, 1975.
We are not unmindful that these decisions hold that such patients are not subject to the same periodic re-examinations as are those committed who have not been charged with criminal offense. Cf. Section 394.467(3)(a), Florida Statutes (1973), Ch. 75-305, Laws of Florida, 1975. However, we have no reason to believe that the trial judges of this State would not respond to a request for a current re-examination and redetermination of the defendant-patient's mental condition at least within a period not to exceed six months; and, if further hospitalization is found to *340 be necessary, thereafter, requests may be made for re-examination at reasonably separated periodic intervals or on the suggestion of the custodial official. Powell v. Genung, supra, Ch. 75-305, Laws of Florida, 1975. However, should such an unexpected denial occur, appropriate remedies are available under the law of this State. The Court now has under consideration an amendment to the present rule which would facilitate such periodic re-examinations.
Appellee argues and we agree that Connors has been accorded all necessary due process rights by the trial court including a hearing and determination by the trial court that she is presently manifestly dangerous to the peace and safety of the people.
Accordingly, the trial court acted in accordance with Rule 3.460, F.Cr.R.P., in requiring that Connors be committed because she is manifestly dangerous to the peace and safety of the people at the present time. To the extent that Section 394.467(3)(b), Florida Statutes, attempts to derogate the authority of the committing judge set out in Rule 3.460, F.Cr.R.P., such statutory provision is superseded thereby.
For the aforestated reasons, the judgment of the trial judge is affirmed.
It is so ordered.
OVERTON, C.J., and ADKINS, BOYD and SUNDBERG, JJ., concur.
HATCHETT, J., dissents with opinion.
ENGLAND, J., dissents.
HATCHETT, Justice (dissenting).
In my opinion, no case or controversy is ripe for decision here. This case began as an ordinary prosecution of a citizen accused of crimes against property, but reaches us in a highly unusual procedural posture. Without doubting the importance of the question presented, I believe the Court oversteps jurisdictional boundaries in reaching the merits. While expressing the view that the legislature disregarded state constitutional limitations by enacting Fla. Stat. § 394.467(3)(b) (1974 Supp.), as amended, the Court fails to observe state constitutional restrictions on its own power, in my view. Accordingly, I respectfully dissent from the judgment of the Court.
A chronology of the case reveals that the accused has dropped out of the proceedings and that only an abstract question remains in her stead. On July 19, 1974, an information was filed accusing Mrs. Christina Irene Connors[1] of stealing a certain automobile. Mrs. Connors had earlier been arrested on this charge and was ordered released pending trial on "personal surety" bond. Because of an unrelated incident, on September 19, 1974, Mrs. Connors was taken by the police to the psychiatric ward of a general hospital, where she was placed under the care of a physician. She was discharged on September 24, 1974, "since there was nothing to justify committing her."
Defense counsel filed a motion for sanity inquisition on October 29, 1974, asking that the court appoint experts to examine his client as to her "mental condition and sanity at the time of the alleged offenses ... and as to her present capacity to stand trial." Attached to this motion were a "psychiatric history", a "psychiatric evaluation" and a "discharge summary". These documents are set forth in pertinent part in the margin.[2] The trial court granted *341 *342 defense motion for sanity inquisition by order dated November 5, 1974, and appointed two physicians to examine the appellant and to answer these questions:
Was the Defendant, CHRISTINA I. CONNORS, mentally competent and responsible on the day/at the time of the alleged commission of the offenses as alleged in the informations in these cases to the extent that she knew right from wrong or was aware of the nature and consequences of her alleged acts?
Was the Defendant, CHRISTINA I. CONNORS, mentally capable on the date of examination of understanding the charges of Petit Larceny[3] and Motor *343 Vehicle Theft which have been placed against her and to be aware of the gravity of the charges?
Was the Defendant, CHRISTINA I. CONNORS, capable on the date of examination of assisting her attorney in her own defense in these trials on the charges of Petit Larceny and Motor Vehicle Theft?
If the examination discloses that the Defendant, CHRISTINA I. CONNORS, is suffering from a mental disease which will incapacitate her in the manner implied by the previous questions, is this mental disease of a permanent or temporary nature?
Missing from the record on appeal is any transcript of proceedings on December 2, 1974, which proceedings were deemed to obviate the necessity for trial by jury, earlier scheduled to begin the following day. The court minutes for December 2, 1974, are in the record and read, in part, as follows:
* * * * * *
The defendant appeared with her attorney, Robert Focht, Assistant Public Defender. The Court found the defendant not guilty by virtue of insanity[4] and committed her to the State Hospital for hospitalization and treatment.
The Court advised the defendant of her right to appeal.
Court recessed at 8:20 p.m.
The trial court's joint judgment of acquittal and order of commitment,[5] and the psychiatrists' letters,[6] incorporated therein by *344 *345 *346 reference, are in the supplemental transcript of record which this Court ordered to be prepared, sua sponte.
On December 6, 1974, the trial court, "having been advised that its [order of commitment] would not be obeyed unless and until [Mrs. Connors] underwent civil commitment pursuant to other provisions of the Baker Act", directed an order to show cause to Dr. Stuart Cahoon, Director of the Division of Mental Health, why he should not be held in contempt of Court for failure to accept Mrs. Connors as an inmate in a mental institution. By motion to dismiss order to show cause, counsel for Dr. Cahoon brought to the trial court's attention Fla. Stat. § 394.467(3)(b) (1974 Supp.) which, as amended, had taken effect only a few months before. In response to Dr. Cahoon' motion to dismiss, the trial court entered a supplemental commitment order dated December 20, 1974, declaring that "Florida Statute 394.467(3)(b) is unconstitutional or otherwise ineffective and inoperative as applied to the defendant ... and all other defendants in like circumstances," and concluding that such a finding "appears to be more appropriate at this time than a continuation of contempt proceedings against Dr. Stuart Cahoon."
In its zeal to vitiate portions of Fla. Stat. § 394.467(3)(b) (1974 Supp.), the majority loses sight of the particular case before us. Even though the trial court's ruling applies specifically "to this defendant," and "other defendants in like circumstances" the majority makes no mention of the fact that neither Mrs. Connors nor any other criminal defendant is any longer a party to this cause. At no time has Mrs. Connors appealed from any order entered in the course of these proceedings. Dr. Cahoon was never adjudged in contempt, and the order to show cause directed to him was effectively dissolved by the order of December 20, 1974, which was entered of record three days later. The only notice of appeal filed in this cause begins, "FLORIDA DEPARTMENT OF HEALTH & REHABILITATIVE SERVICES, DIVISION OF MENTAL HEALTH, Appellant-Defendant, takes and enters its appeal ..." In no accepted sense, however, was the Division of Mental Health, itself an arm of state government, a party defendant in Mrs. Connors' prosecution.
This is not to say that the Division of Mental Health has no interest in whether statutes under which it operates are constitutional. Naturally the Division of Mental Health must be very concerned with such questions, and perhaps it would have standing on just that basis in some action for declaratory relief, brought pursuant to Fla. Stat. § 86.011 (1975). Cf. Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). There is no provision under Florida law, however, for "declaratory appeals." Even where a case is certified to this Court by a District Court of Appeal as presenting a question of great public interest, the Court will refrain from deciding the merits if the question is not squarely posed by the certified case. State v. Burgess, Fla., 326 So.2d 441 (1976). Similarly, questions certified for appellate review pursuant to Rule 4.6, Florida Appellate Rules, 1962 Revision, go unanswered unless they are "determinative of the cause." Rule 4.6(a), supra; Niemi v. Mebane Oil Co., Inc., 303 So.2d 661 (Fla. 4th App.Dist. 1974); Iorio v. State, 297 So.2d 116 (Fla. 4th App.Dist. 1974). In the present case, likewise, the Court is asked to resolve a difference of opinion with no assurance that its mandate will have any concrete effect.
Here as in Ervin v. City of North Miami Beach, 66 So.2d 235 (Fla. 1953) the "real relief sought in this case is an Advisory *347 Opinion of this Court construing a statute." At 236. The Court should decline to grant such relief since the "Constitution of Florida only gives to the Governor of the State the right to request advisory opinions from the Justices of this court ..." Ready v. Safeway Rock Co., 157 Fla. 27, 24 So.2d 808, 811 (1946) (Brown, J., concurring). Certainly the Division of Mental Health of the Department of Health and Rehabilitative Services has not been authorized to seek advisory opinions from the Court. The "judicial power" in Florida, as in the Nation, "is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction," Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 255, 55 L.Ed. 246, 252 (1911), with the lone exception of gubernatorial requests for advisory opinions. When the Court overreaches its jurisdiction in order to decide questions which do not "determine actual controversies," it invades the province of the other branches of government.
Ostensibly, the majority agrees with Mr. Justice Brown, when he wrote in Ready v. Safeway Rock Co., 24 So.2d at 810:
We must not forget that ... our Constitution divides the powers of the State of Florida into three grand divisions, the legislative, the executive and the judicial departments.
It is on the ground of separation of powers that the Court today strikes down a statute which was reenacted, as amended, by unanimous vote of both houses of the legislature in the 1974 session. 1974 Journal of the House 1235; 1974 Journal of the Senate 788. According to the majority, the statute conflicts with a previously adopted court rule, and must therefore fall. But see Fla. Const. art. V, § 2(a) (1973). Whenever possible, however, striking down "a solemn act of the Legislature," Sarasota-Fruitville Drainage District v. Certain Lands, etc., 80 So.2d 335, 337 (Fla. 1955) should be scrupulously avoided. Singletary v. State, 322 So.2d 551 (Fla. 1975); Williston Highlands Development Corp. v. Hogue, 277 So.2d 260 (Fla. 1973); Overstreet v. Blum, 227 So.2d 197, 199 (Fla. 1969). The majority asserts that such extreme action must be taken in the present case in order to preserve the separation of powers intact. Ironically, in the name of preserving the separation of powers, the Court has blurred the distinctions between the separate branches of government by passing on a statute as a general proposition, in much the same way the governor might, when exercising the power of the veto.
NOTES
[1] Section 394.467(3)(b) [Chapter 74-233], provides:

"(b) In the event a person is ordered into a treatment facility under the provisions of the Florida Rules of Criminal Procedure or chapter 801 or chapter 917, the order shall adequately document the nature and extent of a patient's mental illness. Any person adjudicated not guilty by reason of insanity pursuant to Rule 3.460 of the Florida Rules of Criminal Procedure shall be committed to the division for hospitalization and treatment in accordance with the provisions of this part. No person charged with a misdemeanor shall be committed to the division solely by Rule 3.210 of the Florida Rules of Criminal Procedure, but shall be admitted for hospitalization and treatment in accordance with the provisions of this part. The treatment facility may accept and retain a patient so admitted for a period not to exceed six months whenever the patient is accompanied by a court order and adequate documentation of the patient's mental illness. Such documentation shall include a psychiatric evaluation and any psychological and social work evaluations of the patient and document the results of any criminal investigation on the patient. If a patient is considered to be suffering from an emotional illness to the extent that he cannot participate in his own defense, such documentation should include details regarding the evaluation which led to that conclusion. If further hospitalization is necessary at the end of his authorized treatment period, the administrator shall apply to the hearing examiner for an order authorizing continued hospitalization."
[2] In 1975, the Legislature of the State of Florida adopted Ch. 75-305 which added paragraph (h) to Section 394.467(4), Florida Statutes, to accord with Powell v. Genung, supra.
[1] Defense counsel represented to the trial court that Christina Welch and Christina Irene Connors are one and the same person.
[2] PSYCHIATRIC HISTORY

Admitted 9-19-74
CHIEF COMPLAINT: This grossly obese white female was brought here by the police. Apparently she was intoxicated and was behaving in a very destructive manner, breaking windows, screaming and hollering, and was unable to account for herself. When brought to the hospital she was uncooperative and did not comprehend why she was here at all, but the next day she complained that she was brought here under false pretext, that there was nothing wrong with her, she was only having an argument with her boyfriend, and the police are exaggerating and had beaten her up and have been against her all of the time. Obviously the patient has no recollection of what happened prior to the admission or she is minimizing the problems.
PRESENT ILLNESS: The present illness was precipitated by an argument with her boyfriend, with whom she has been living for the past two months. She claims that she was moderately drunk but does not admit that she was disturbed in any way and feels that she does not need to be here at all, and there are charges framed against her by the police, who just want to harrass her. At the same time she admits that she has had some psychiatric problems in the past and had been in the following program in Andover, New Jersey but she has not been following through regularly.
PAST HISTORY: The patient has had a psychiatric hospitalization in Andover State Hospital in New Jersey but prior to that she claims that she has had no problem other than gross overweight, for which she finds no reason. She claims she does not eat too much, but in spite of that, her weight problem has been tremendous.
MEDICAL HISTORY: The patient gives no history of previous illnesses or operations other than the obesity. She has had one child, who is now age 7, who lives with her parents, has had no other serious illnesses or operations.
INVENTORY OF SYSTEM: She claims that she has irregular vaginal bleeding. There is no evidence of dizziness, convulsions, etc. GI system is negative. Respiratory system negative.
SOCIAL HISTORY: Apparently the patient is the second child in the family and she was always close to the family and did not really make anything on her own. When her mother divorced her father, she was rather upset and started living on her own. At this time she said she got married to a boy and the marriage lasted for a short time. She has a child by this marriage. She is unable to take care of this child and he is now living in a foster home in New Jersey and she came here to Florida to plan moving here to her mother's. Her mother now is remarried and the patient claims that since the mother has remarried, she has been upset and this is why she had to "shack up" with her present boyfriend with whom she does not get along. The patient does not seem to have a satisfactory work history.
FAMILY HISTORY: As mentioned above, she only has a mother and a sister with whom she has no contact. Her husband is dead and she has a son six years old who lives in a foster home. ____________________________________________________________ ______________________________________________
PSYCHIATRIC EVALUATION MENTAL STATUS EXAMINATION: This fairly obese 28-year old white female appears to be rather agitated and restless, and wants to be released here on demand, and she claims there is nothing wrong with her, etc. Her speech is relevant and coherent, but very guarded and does not really elaborate on many things which are unexplainable. Obviously it seems to me that the patient has difficulty trusting people and avoids direct eye contact. I feel that the patient is rather paranoid but knows how to cover up fairly well. She denies any hallucinations, no delusions could be elicited except that everybody is against her and the police are framing charges on her, etc. She claims that most of the things that the police say that she said were framed up to keep her here, which seems to me to be a paranoid delusion rather than her trying to minimize her symptoms. She obviously minimizes and denies that she is ill at all, and has very poor insight into her problem and very poor judgment. She is oriented in all spheres. She appears to be functioning at a border-line level of intelligence and appears to have a very poor impulse control and rather immature for her age and she has a lot of dependency needs, especially on her mother, and it seems that the present episode might have been precipitated by the fact that the mother has remarried.
PSYCHODYNAMICS AND SOCIODYNAMICS: I think the patient is rather immature and has poor impulse controls, is at the same time dependent on her mother, has a poor work history, etc., which suggests that she is a dependent personality and has difficulty in inter-personal relationships, with the result that any trauma precipitates a psychotic attack. The present one was probably precipitated by her being separated from her mother because of the mother's remarriage, which she could not face. She does not seem to have any sustained interest in any job situation or anywhere, has lived on welfare, and has not satisfactorily done any work in the past.
PRECIPITATING STRESS AND PREMORBID PERSONALITY: As mentioned above, I think the separation from her mother due her marriage and separation from her son, due to her inability to take care of him, have both been working on her and this has built her up into a state of paranoid delusion because everybody is against her because things are not going exactly as she plans. The patient has no strength to really do anything on her own without some direction.
TENTATIVE DIAGNOSIS: I think the patient is a paranoid schizophrenic who is well able to cover up her symptomology and I think the alcoholic intoxication precipitated the acute psychotic episode.
PROGNOSIS: Guarded.
DISCHARGE SUMMARY
Admitted: 9-19-74
Discharged: 9-24-74
PROVISIONAL DIAGNOSIS: Acute psychotic episode.
REASON FOR ADMISSION: Apparently patient was behaving in a very destructive and bizarre fashion and was intoxicated and the police were called on the scene when she was seen breaking windows, etc. and was not able to control herself. When she was brought in here she claimed that there was nothing the matter with her, the police are against her and this is why they have made a false arrest, etc. etc. and did not seem to comprehend what was happening at all. According to the patient she has had no complaints whatever and everything that happened was just a slight argument between her and her boyfriend  with whom she has been recently living.
SIGNIFICANT FINDINGS: The physical examination revealed that the patient is grossly obese and with a blood pressure of 140/90 and the rest of the systems were within normal limits. She complained that she had irregular vaginal bleeding but does not appear to be anemic or anything to substantiate this.
Psychiatric examination revealed a 28 year old agitated restless woman who was unable to comprehend what was happening. She was demanding to be released from here, appeared to be very paranoid about the whole staff here as well as the police who had brought her here. Claimed that everybody was against her and trying to frame charges on her. She denied any hallucinations and no obvious delusional material other than this paranoid ideation could be noticed. She had obviously very poor insight and very poor problem and at the time of admission she was intoxicated.
Lab workup showed that the patient's hemogloblin and BBC and WBC were within normal range. VDRL was negative. SMA-17 was normal. Urinalysis showed no abnormality. Chest x-ray was within normal limits.
TREATMENT RECEIVED: Patient was encouraged to participate in all the activities and the milieu therapy which she very reluctantly did and always demanded to be released and claimed that she was not sick at all and did not get any insight into her problem. However, she was also put on Thorazine 100 mgm. b.i.d. and 200 mgm. at hs which seemed to calm her down to a certain extent. All through the stay she complained about the medication, though admitted at times that it was relaxing her and make her think clearly. After about 48 to 92 hours she accepted that she needed some help and revealed that she has had previous psychiatric admissions into other hospitals and seemed to gain some insight into her problems. But basically the patient did not participate in any other activities other than just medication and on the 5th day she refused to sign voluntarily, and since there was nothing to justify committing her the patient was allowed to go at her own request in care of the police.
CONDITION ON DISCHARGE: Improved.
PLANS FOR FUTURE CARE: Including prescribed medications, patient has been discharged on 100 mgm. of Thorazine b.i.d. and 200 mgm. hs. She has been given 2 weeks supply and has been advised to continue her follow up with the Pasco County Mental Health Clinic.
FINAL DIAGNOSIS: Physical  the patient appears to be grossly obese and had mild hypertension and should be treated for this on the out-patient basis.
Psychiatric  SCHIZOPHRENIA, PARANOID TYPE.
[3] Although no accusatorial pleading alleging petit larceny is part of the record before us, it appears that the subject of the alleged petit larceny consisted of the contents of the automobile in question.
[4] Apparently no ruling was made by the trial court pursuant to Rule 3.210(a), RCrP as to Mrs. Connors' competency to stand trial. See Fowler v. State, 255 So.2d 513 (Fla. 1971); Emerson v. State, 294 So.2d 721 (Fla. 4th App.Dist. 1974). There is no indication in the record that Mrs. Connors or her counsel raised the defense of insanity by filing notice pursuant to Rule 3.210(b), RCrP.
[5] This cause coming on to be heard for determination of Defendant's sanity at the time of the alleged offenses with a stipulation by the State and the Defendant that said issue shall be determined fully from the reports heretofore received from Drs. W.H. McConnell and Peter J. Spoto, upon Non-Jury Trial, and upon the stipulation of the State and the Defendant that said issue also be determined solely from the reports of the aforesaid examining physicians and the Court having received the stipulation and having carefully reviewed said medical reports finds as follows:

1. That at the time of the alleged offenses, the Defendant was suffering from paranoid schizophrenia; that she did not know right from wrong and was insane.
2. The discharge of the Defendant would be manifestly dangerous to the peace and safety of the people with whom Defendant might come in contact.
Therefore, you, Christina I. Connors, being now before the Court, attended by your attorney, Robert Focht, the Court having returned a verdict of Not Guilty by Reason of Insanity, the Court does hereby adjudge you Not Guilty by Reason of Insanity of the offenses of Motor Vehicle Theft and Petit Larceny.
Pursuant to Rule 3.460, Florida Rules of Criminal Procedure, the Defendant, Christina I. Connors, is hereby committed to the Division of Mental Health of the Department of Health and Rehabilitative Services, pursuant to Florida Statute 394.67(3)(b) and the reports of each of the examining physicians are hereby incorporated herein by reference and made a part hereof.
DONE AND ORDERED in open Court at New Port Richey, Pasco County, Florida, this 2nd day of December, 1974.
[6] Dear Judge Keough,

Thank you for referring Miss Christina I. Connors, age 28, to this office. She was brought to my office by Mr. Lecouris of the Public Defender's office on Nov. 14, 1974. She was interviewed alone for background information and then she was examined alone at length.
Miss Connors who is short and obese was concerned but pleasant and cooperative. She stated that she had frequent headaches, was easily upset and excitable sometimes to the point of developing blackouts lasting an hour or more. She admitted to very faulty memory particularly since receiving electroshock therapy in a New Jersey Hospital some three years ago.
She said her parents were divorced when she was six years old and that there had always been much conflict between her mother and herself especially since the birth of the patient's illegitimate son, now age 9 years. She admitted she had a long record of petty misdemeanors and frequent jailing since about 1964. When asked why, she said she needed to steal because she could not afford to clothe her son and herself. In about 1967, she began sniffing glue for relief from the constant bickering by her mother about her small son. This lead to further anti-social acts and more arrests for "glue sniffing". About three years ago, her son was removed from her custody and she admits to a nervous breakdown that lead to her commitment to the New Jersey State Hospital where she received electroshock therapy. She does not remember any symptoms but does remember that she was admitted three or more times, the last of which was apparently in the spring of 1974. She was put on Thorazine and advised to not work, come to the South and now she is receiving Social Security disability checks of about $147.00 a month.
She did come south because her mother who had remarried lives here with her husband. Due to a very faulty memory time and events are very vague and sketchy but she said she arrived in a Mississippi licensed car which she said she bought for $800.00 and which others say was stolen. On June 28, 1974, her latest altercation with the law occurred which is well documented and witnessesd in which she arrived at a bar with a bundle of her clothes and she ordered something to drink. She with the clothes was observed leaving in a car, not hers. The car had been left unattended with the keys, a watch and some tape decks. The car was subsequently found several blocks away with her clothes in it. In the meantime, she attempted unsuccessfully to sell the watch. A short time later she was located nearby and denied having taken the car but on demand, gave up the keys and watch and also identified her clothes that were in the car.
According to her version which she had maintained since the first until and including my examination, she and her mother had a bad argument. She decided to leave her mother's home and packed her clothes in a bundle. She went to the bar to have a drink and later she went back home where the police showed up and arrested her. She said she became very upset and emotional which lead to her being hospitalized in a Tampa hospital where she remained for two weeks. Prior to her actual arrest, she denies any blackout saying she remembers perfectly everything from the time of her fight with her mother until she got back home. Being unable to account for her clothes being in the car, she says someone must have taken them from the bar and put them there.
It is to be noted at this point that she freely admits to having periodic "blackouts" that are usually preceded by something unpleasant like being aggravated, accused, criticized, even drinking alcohol, and, in the past, too much "glue sniffing". She also freely and unashamedly admits to shop-lifting, stealing, etc. under the excuse of need, and freely without a show of emotion, admits to mental and emotional disturbances requiring hospitalization, treatment and constant medication. It is indeed strange, except in a mental case, that she so tenaciously sticks to her story of the last two car appropriations when she appears to be without shame, humiliation or embarrassment concerning so many of her previous anti-social activities, the birth of her illegitimate child as well as her own history of mental instability.
The MENTAL STATUS EXAMINATION showed a woman with an actual, apparent and mental age of about 28, with a rather blank, unemotional expression. Her personality was ambiverted tending toward introversion. She alleges 11 years of education in a Catholic school in Philadelphia. There appeared to be no increase in tension and she seemed perfectly relaxed. Mental reaction was very sluggish and she had an extremely poor memory for past events in which she confabulated to cover up unremembered dates, times and places. Present memory was questionable. She was cooperative and interested and was concerned about her health and mental condition.
She is in flight from the world of reality and responsibility. Insight and judgment are extremely poor. Her attitude was somewhat downcast and she blames everyone else for her troubles including her mother and the police. Behavior is within normal limits at this time. She is oriented as to time, place and person and denied specific hallucinations, illusions or delusions while on medication. She alleges no memory of past psychotic symptoms but there is a strong indication that she does suffer from delusions of persecution, and it is to be remembered that she is receiving disability checks following her last hospitalization in the New Jersey State Hospital.
It is my opinion that the diagnosis is Paranoid Schizophrenia, in a state of poor remission even on medication and that she is borderline in regards to her competency or incompetency.
In answer to the question of Miss Connor's competency on June 28, 1974, only an educated guess can be given after almost four & 1/2 months of elapsed time. She allegedly had been released only a short time from the New Jersey State Hospital. It is not known whether she continued to take her medication (Thorazine); there was an alleged conflict with her mother; she was drinking and she denied in the face of all evidence that she illegally took either car, and it is a fact she was placed in the mental ward of a Tampa hospital following her arrest. I believe it would be safe to say that she was incompetent and did not know right from wrong at that time.
On the date of my examination, she appeared to be fairly competent, appeared to know right from wrong and was very much aware of the gravity of the charges placed against her.
On the date of my examination she was capable of assisting her attorney in her own defense for present occurrences but probably would be ineffectual as regards the times of her alleged offenses.
It is my opinion that she is suffering from a reoccurring psychotic disability that shows up under stress in which she attempts to strike back at all the unfairness that the world, her family and others perpetrate upon her. During these periods, she does many anti-social acts that later, particularly under the threat of punishment, are excluded from her mind. When there is no stress and she continues with her treatment, she can make an adjustment and even hold down jobs that are not too demanding. Since it is the nature of this type of psychosis to recur under stress, it is respectfully suggested that she be put on probation and let out of jail only so long as she remains under the active care of a qualified doctor or clinic who would be empowered to hospitalize her whenever she becomes periodically incompetent.
Respectfully,
W.H. McConnell, M.D.
Dear Judge Keough:
As ordered by you I have performed a psychiatric examination on Christina I. Connors a 28 year old, short, obese female who had poor oral hygiene and decayed teeth were evident. She was brought here by her Public Defender who stated she was out on bond. She completed all of her examination with full cooperation on her part. She was extremely friendly and cooperative and did not hesitate to give a full account of her past history which is of significance in that she has been quite disturbed, both mentally and emotionally, off and on since about 1967. At that time she began sniffing glue. She had a tragic beginning and an extremely traumatic early life which, I am sure, contributed to her disturbance.
Her mother is 48 years of age and has a weight problem. She lives in New Port Richey. She has been married four times. The patient's real father is 52 years of age. They were divorced when the patient was five years old. The patient has three step brothers ages 4, 5, and 9. She stated "the 5 year old is retarded". She has two sisters, ages 27 and 26, who are apparently in good health.
She was born in Philadelphia, Pennsylvania on April 1, 1946. She had an eleventh grade education and quit school at age 16. She had a common law relationship with a man and there is a child, a male age 9, who is a ward of the Court and is out of the State at the present time. She is on disability through Social Security because she is not able to work. She characterizes her problems as headaches, which she knows are emotional, and blackout spells. Despite her obesity, she stated she has had a recent weight loss of 25#. She came to Florida five months ago and was living with a man at the time of the alleged act because "we shared expenses."
According to the Statement of Facts the alleged act occurred on June 28, 1974. Following this alleged crime the patient had an acute psychotic episode which necessitated hospitalization. She was hospitalized on September 19, 1974 and discharged on September 24, 1974 with condition on discharge as improved and the final psychiatric diagnosis on discharge was Schizophrenia, paranoid type. She did not sign a voluntary hospitalization and for this reason she was discharged in care of the police. This occurred approximately three months subsequent to the alleged date of the motor vehicle theft and petit larceny.
From the description of the Statement of Facts if this individual was drinking at the time, and she probably was, it would seem to me that she did not know right from wrong at the time of the alleged act. She probably was psychotic at that time. She denies any knowledge of taking the car.
There is past history of hospitalizations in another State and she is on disability at the present time probably because of her mental illness. As stated above, she began sniffing glue in 1967. She was hospitalized two or three times at the Ancora State Hospital in New Jersey in 1967 and she was hospitalized at the Trenton State Hospital in 1969.
At the time of my examination it is my feeling that she is able to understand the charge of Petit Larceny and Motor Vehicle Theft which has been placed against her and she is also aware of the gravity of these charges. She is capable, at this time, of assisting her attorney in her own defense on these charges. The patient is suffering from a chronic mental illness which has exacerbations and remissions and I am sure this will give her difficulty from time to time. The patient should have continued treatment at the local Mental Health Clinic. I think she is receiving treatment at the local Mental Health Clinic because she was referred there by her physician when she was hospitalized at the Tampa Heights Hospital in September of 1974. She stated she is taking Thorazine 100mg, b.i.d. and Thorazine 200 mg., at h.s.
Sincerely,
Peter J. Spoto, M.D.